## LOUISVILLE TRUST CO. v. CITY OF CINCINNATI.

(Circuit Court, S. D. Ohio, W. D. April 4, 1896.)

### No. 4,797.

1. STREET-RAILWAY COMPANIES—ACQUIRING RIGHTS IN STREETS—CONSENT OF AUTHORITIES.

The C. Inclined Plane Ry. Co. was organized under the general incorporation act of Ohio for the purpose of constructing a railway in the city of C. Such railway was constructed chiefly on land owned in fee by the company, and the company acquired the right to cross certain streets of the city by an ordinance which limited such right to 20 years. The act under which the company was organized gave it power to acquire by condemnation the right to cross such streets, but the company never took proceedings to condemn the same. *Held*, that though the franchise of the company to exist as a corporation and to operate its railway might be perpetual, and though it owned the land on which its road was constructed except at the street crossings, and the land on both sides of such crossings, none of these facts gave it the right to operate its road across the streets in perpetuity, without the consent of the city; and, upon the expiration of the 20 years to which the city's grant of such right was limited, it became a trespasser, and lost the right to operate its road.

2. SAME—CONDITIONS—CONSTRUCTION OF STATUTE.

Subsequent to the organization of the C. Inclined Plane Ry. Co., an act was passed by the legislature providing that any inclined plane railway company organized as said company was organized should have power to hold, lease, or purchase, and maintain and operate, any street railroad connecting with its inclined plane, upon the same terms and conditions on which it held and operated its inclined plane, such lease or purchase to be made upon the consent of the stockholders of both companies. Under this act, the C. Inclined Plane Ry. Co. acquired a connecting street railroad which had previously been constructed by other parties, under contract with the city granting it the use of the streets on certain conditions for a limited term, and requiring the payment of a license fee for each car operated. *Held* that, the terms of the statute not having given to the C. Inclined Plane Ry. Co. the right to operate a leased or purchased line in perpetuity, no such right could be implied, nor could such statute require the city to grant the use of its streets, except on its own terms, and that the C. Inclined Plane Ry. Co. took the connecting line which it acquired subject to the terms on which such line was permitted to use the streets, and, upon the expiration of the term for which that right was granted, lost the right longer to operate such road.

3. RES JUDICATA—STATE AND FEDERAL COURTS—STATE STATUTES.

The city of C. brought an action in a state court against the C. Inclined Plane Ry. Co., to recover license fees for the operation of cars on the connecting line acquired by the C. Inclined Plane Ry. Co., and to enjoin that company from operating such connecting line; and the state court, upon construction of certain state statutes conferring powers on municipal corporations, and imposing limitations thereon, gave judgment in favor of the city for the license fees, and for the injunction sought, which judgment was affirmed by the state court of last resort. *Held*, that such judgment was conclusive as to the right of the C. Inclined Plane Ry. Co. to continue the operation of the connecting line, and binding upon the federal court, in a suit afterwards brought by the trustee under a mortgage of the C. Inclined Plane Ry. Co.'s lines against the city of C., to enjoin interference with the operation of such lines.

4. ESTOPPEL—USE OF STREETS BY RAILWAY COMPANY.

*Held*, further, that the city of C. was not estopped to assert its right to terminate the operation of the line acquired by the C. Inclined Plane Ry. Co., at the termination of the limited period, either by the fact that the C. Inclined Plane Ry. Co., immediately after the passage of the permissive statute, acquired the connecting line upon a lease extending beyond the

period for which it had the right to use the streets, or that license fees were neither paid to nor demanded by the city, or that the C. Inclined Plane Ry. Co. had made mortgages of its property, or that an administrative board of the city had consented, at the request of the company, to its altering its tracks and motive power.

5. FEDERAL COURTS—INJUNCTIONS—REV. ST. § 720.

The federal courts are prohibited by Rev. St. § 720, from issuing an injunction staying a party at any stage of the proceedings in a state court, and therefore from enjoining a party from proceeding to enforce a judgment obtained by him in a state court.

The complainant, a Kentucky corporation, sues as trustee under a mortgage executed January 1, 1889, by the Cincinnati Inclined Plane Railway Company, to secure the payment of its negotiable bonds to the amount of $500,000, with 6 per cent. interest.

The mortgage covers the inclined plane railway of the mortgagor, including the machinery, engines, boilers, and fixtures connected therewith, and the real estate and right of way upon which the same are situated, in the city of Cincinnati, Ohio; also, the street railway known as "Route No. 8," in said city, and all the street railways owned and held by the mortgagor, together with the electric plant, poles, wires, and machinery connected therewith. and all cars and other rolling stock, tracks, easements, right of way, animals, rights, privileges, and franchises; also, all real and leasehold estate, and all other property, rights, privileges, and franchises then owned, or which might thereafter be acquired, by the mortgagor, as well as all tolls, rents, income, profits, claims, and demands, of every nature, to be thereafter acquired by the mortgagor. The trusts created by the mortgage were accepted by the complainant on the 23d of January, 1889.

The Cincinnati Inclined Plane Railway Company was organized on the 31st of April, 1871, under the general corporation act of the state of Ohio, of May 1, 1852, for the purpose of constructing a railroad, the termini of which were to be in the city of Cincinnati and the village of Avondale, in Hamilton county, Ohio. On February 23, 1889, the Avondale terminus was, by proceedings in accordance with the laws of the state of Ohio, extended to the village of Glendale, Hamilton county, Ohio.

In 1871 said railway company constructed an inclined plane railway upon the land held by it in fee, and upon a portion of Locust street, the occupancy of which and the crossing of Miami, Baltimore, and Dorsey streets, so as not to obstruct the ordinary passage along the same, was granted by the proper city authorities of the city of Cincinnati, under the twelfth section of the act of May 1, 1852. The company, since the construction of the inclined plane railway, has maintained and operated, and now maintains and operates, the same. At the time of the making and delivery of said mortgage, and of the bonds therein described and secured, i. e. in January, 1889, the railway company owned and held, and was maintaining and operating,—under and by virtue of certain ordinances of the city of Cincinnati, and under a perpetual lease from Smith, Hill, and Doherty. the original proprietors and the constructors of said railway, and under and by virtue of an act of the general assembly of the state of Ohio, passed March 30, 1877 (74 Ohio Laws, 66), entitled "An act relating to inclined plane railway companies organized under the act of May 1, A. D. 1852, entitled 'An act to provide for the creation and regulation of incorporated companies in the state of Ohio,' "—a street railway from the foot of the inclined plane railway, at the head of Main street, Cincinnati, by a double track, to Court street; thence west, on Court street, by a single track, to Walnut street; thence south, by a single track, on Walnut, to Fifth street; thence east, by a single track, on Fifth street, to Main street; thence north, by a single track, on Main street, to the intersection with its track at Court street; and also a street railroad extending from the head of its inclined plane railway, by a double track, along Locust, Mason, Auburn, and Vine streets, to the Zoölogical Garden, in Avondale, a distance of two miles.

The bill sets forth: That prior to January, 1889, the cars of the street railways were drawn by horses or mules; and that on September 24, 1885, the

board of public works of the city of Cincinnati, under and by virtue of said act of March 30, 1877, by resolution, consented to the use by said railway company of electricity, cable, or compressed air as a motive power "upon the highways in which the street railroads connected with its inclined plane, held and operated by it, are laid," on condition that the railway company should give bond in $25,000 to indemnify the city against damage to persons or property by reason of the use of such motive power, which bond was duly given and accepted. That on October 10, 1888, the railway company recited the resolution of September 24, 1885, stating, in writing, to the board of public affairs of the city (the successor of the board of public works), that it had decided to use electricity as a motive power on its road, and requested permission to erect along its lines the poles, wires, and other appliances necessary for such use. That on October 24, 1888, the board of public affairs, under and by virtue of said act of March 30, 1877, and in furtherance of the grant made by the board of public works, gave said railway company the permission requested, in accordance with plans and specifications of the Sprague system submitted to and approved by said board, and said permission applied to the entire line of said company's road, from Fifth and Walnut streets, in Cincinnati, to the Zoölogical Garden.

That on November 23, 1888, said railway company entered into a contract with the Sprague Company for the construction of the Sprague system. That in December of the same year the copper-wire rail connections were made, and in the spring of 1889 the poles and wires were erected, all under the supervision of the civil engineer of said city, and of said board of 'public affairs; and about the beginning of June, 1889, said company put its street railways in successful operation under the Sprague system so far as the Zoölogical Garden. That on the 23d day of March, 1891, the board of county commissioners of Hamilton county, Ohio, the public authority which owned and controlled the Carthage turnpike, in due form granted said railway company authority to use and occupy said turnpike with double tracks, with the necessary appendages and appurtenances, including poles and wires, of an overhead electric street-railroad system, and to run its cars thereon in the same manner and by the same system as that under which they were run and operated upon its existing tracks. This resolution was reaffirmed, with certain temporary modifications, by resolution of said board of county commissioners passed September 7, 1889. By resolution of the trustees of the Zoölogical Land Syndicate, passed April 6, A. D. 1889, said railway company was granted the right to construct and extend its double tracks, with the necessary appendages and appurtenances of an overhead electric street-railroad system, from its then northern terminus, at the Zoölogical Garden and Erkenbrecker avenue, and thence along said avenue, of which said syndicate were owners, to the Carthage pike, at or near its intersection with Ludlow avenue.

The bill further avers that said railway company, in the year 1889, under and by virtue of the grant and resolution above set forth, and with the consent of the villages of Clifton, St. Bernard, Elmwood, and Carthage, constructed and extended its railway upon Erkenbrecker avenue and the Carthage turnpike to the County Fair Grounds, adjoining the village of Carthage, a distance of five miles, and subsequently equipped the same with the Sprague electric system, and an additional power house, with the machinery for generating electricity, located on the banks of Ross run, just north of the village of St. Bernard.

In the year 1889, in order to comply with the requisitions of the board of public affairs of October, 1888, and to operate the railway by electricity so that the cars could be run from Fifth and Walnut to the Zoölogical Garden without change, certain streets were regraded and filled, at great expense. All the tracks were relaid. The inclined plane railway and the tracks run thereon were reconstructed, as was also the power house at the head of the inclined plane. New engines and boilers and the machinery necessary for generating an electric current were put therein.

It is further averred that the defendant, the city of Cincinnati, in the year 1886, repaved Court street, from Main street to St. Clair alley, with asphalt, and thence to Walnut street with granite; also, Fifth street, from Walnut to Main, with asphalt. In the year 1887, the city repaved Walnut street, from Court to Fifth, and Main street, from Fifth to Court, with asphalt. By

reason of such repaving, the railway company found it necessary to, and did, reconstruct and relay, at great cost, expense, and inconvenience, all its tracks on said streets; and said reconstruction and relaying were done with the knowledge and under the supervision of the defendant, and the expense thereon created part of the floating debt which was provided for by the issue of said mortgage bonds.

The complainant further avers that by deeds duly recorded on the 11th of October, 1889, and on the 11th of July, 1890, there was conveyed to said railway company, for an aggregate consideration of $61,462.50, that portion of the street railroad which is known as the "Mt. Auburn Street Railroad," and which had been leased, as above stated, perpetually by Smith, Hill, and Doherty to said railroad company; and that said purchase was made in pursuance of the privilege of purchase contained in said lease.

It is further averred that all the said $500,000 of bonds secured by the mortgage above referred to, excepting $125,000 thereof, reserved for exchange for a like amount of bonds secured by a mortgage to Henry Peachy and William A. Goodman, trustees, were issued and sold at par prior to July 1, 1890, in accordance with the provisions of said mortgage, and are now outstanding and unpaid in the hands of innocent holders, who are not residents or citizens of the state of Ohio; that the proceeds arising from the sale of said bonds were duly applied by said railway company for the purposes specified in resolutions of the stockholders of said railway company, as set forth in said mortgage, and especially to defray the expenses incurred in reconstructing, extending, and equipping with electric motive power the line of railway of said company as hereinbefore stated.

The complainant then proceeds to state, upon information and belief, that by virtue of proceedings duly taken under the laws of Ohio, in addition to the $500,000 of common stock theretofore issued and outstanding, there was authorized on the 1st of December, 1890, to be issued, and there was issued and sold, $150,000 preferred stock of said railway company, and the proceeds of the sales thereof were to be, and were, used for the purpose of extending said company's road, increasing its machinery and rolling stock, making improvements, and paying its unfunded debts.

The complainant then sets forth that notwithstanding said railway company constructed said inclined plane railway in the year 1871, and at the time of making the mortgage and issuing the bonds, as hereinbefore stated, owned and held, and was maintaining and operating, the same and the street railways hereinbefore described, without any question as to its right so to do being made by the state of Ohio, or by the defendant, or by any other public authority, the defendant, by its officers and agents, is giving out and asserting in the public prints, by public speech and otherwise, that said railway company has no right to hold, maintain, and operate said inclined plane railway and said street railways leading to and connected therewith; and that said railway company is a trespasser upon the streets where its tracks are located, and is unlawfully maintaining the necessary poles, wires, and other appliances for the operation of the same by electricity as a motive power; and that the defendant, by its officers and agents, threatens to remove said tracks, with said appliances, or to grant the right to use the same to a rival company holding and operating a parallel and competing line in said city, and known as the "Cincinnati Street-Railway Company," and to thus usurp and take away the property, rights, and franchises of the said inclined plane railway company; and that all said actings and doings of said defendant are unlawful, and contrary to equity and good conscience, hurtful to said railway company's credit and business; that they tend greatly to depreciate its bonds in the market, and to destroy the security thereof, and to delay and stop said company in the work of extending, equipping, and improving its lines, and thereby greatly cripple it in its service of the public, as well as in its revenues, and render it unable to earn sufficient to pay the interest and principal of said bonds.

The bill then charges that "the charter of the said railway company, and the rights and franchises acquired thereunder, and under the laws of the state of Ohio, constitute contract rights between the said state and city, on the one part, and the said railway company and your orator, on the other; and that these contract rights still exist, and give the said railway company a perpetual right to maintain and operate its said inclined plane railway and its said lines

of railway in the streets of said defendant, subject to the amending powers of the legislature of the state of Ohio; and that the proposed action of said defendant will impair, annul, and destroy the obligation of said contract rights, in violation of section 10, art. 1, of the constitution of the United States."

The prayer is that, pending the suit, "the defendant, its officers, agents, servants, and attorneys, be enjoined from in any way interrupting or interfering with said railway company, its agents and servants, in the lawful use of said streets, or the lawful operation of its said lines, or from in any way interfering with, interrupting, or disturbing the said railway company in the construction, operation, and maintenance of its lines and system in the city of Cincinnati; that, on the final hearing, said injunction be made perpetual;" and that complainant may have all such further relief as may be consonant with equity and good conscience, and that the nature of the case may require.

The city of Cincinnati, by its answer, denies that the relaying and reconstruction of the tracks of the inclined plane railway company on the streets named in the bill was done with its knowledge and under its supervision, and declares that it does not know and cannot set forth as to its belief whether said relaying and reconstruction created the floating debt, and provided for by the use of bonds, as averred in the bill; nor whether the said $500,000 of bonds were issued and sold prior to July 1, 1890, or whether they are now outstanding and unpaid, or whether the proceeds were applied to defray the expenses incurred in reconstructing, extending, and equipping with electric motive power the line of railway of said company, as averred in the bill; nor whether $150,000 of the preferred stock of said company was issued and sold, or whether the proceeds of the sale thereof were to be, and were, used for the purpose of extending said company's road and otherwise, as averred in the bill.

The answer further denies that the charter of said railway company, and the rights and franchises required thereunder, and under the laws of Ohio, constitute contract rights between the state and city and said railway company and the complainant, or that those rights still exist, and give said company a perpetual right to maintain and operate its inclined plane railway and its line of railway in the streets, subject to the amending powers of the legislature of the state of Ohio, as averred in the bill, or that the proposed action of the defendant will impair, annul, and destroy the obligation of said contract rights, in violation of section 10, art. 1, of the constitution of the United States. The defendant says that it had no knowledge or notice of the making of the mortgage described in the bill, or of the issue or sale of any bonds secured thereby, until long after the execution of said mortgage.

Further answering, the defendant sets up the following city ordinances: July 1, 1859, prescribing the terms and conditions of street passenger railroads within the city of Cincinnati. By section 4, it was made the duty of any company or individuals to whom any privileges thereunder should be granted to keep in repair the streets occupied by their tracks; and on failing to do so, the city council reserved the right to remove the rails, and prevent the use of said streets for railway purposes. By section 15 all contracts for the construction and operation of street railroads under its provisions were to be for the term and period of 20 years. November 6, 1863, amending said section 4, and releasing the several street-railway companies having roads then in operation from the obligation to bowlder any unbowldered streets. October 20, 1865, supplementary to and amendatory of said ordinance of July 1, 1859, and repealing the fourth section thereof. It also provided that all street passenger railroad companies to which the right to construct and operate any route had been granted by the city, whether theretofore constructed or to be constructed under grants theretofore made, should, upon agreeing to pay annually a car license of $100 for each car run upon the respective roads, during the term for which the license should be granted, be released from all obligation to repair streets or gutters, and that the city should assume entire control thereof and responsibility therefor. February 7, 1879, providing for the construction, operation, and government of said street railways; and, by section 14, that the right to operate any road constructed under its provisions, or coming thereunder by filing a written acceptance and bond, as therein provided, should continue for a period of 20 years only from the date of any such grant or acceptance. August 19, 1864, fixing Route No. 8 for street pas-

senger railroads, and requiring the board of city improvements to advertise for bids for the same. Route No. 8 is described in the ordinance. It covers the line of the roads operated by the inclined plane railway company within the city limits. The person or company awarded the route was made subject to the provisions of the general ordinance prescribing the terms and conditions of street railroads in the city of Cincinnati, passed July 1, 1859, excepting that such person or company should not be required to purchase any omnibus line or stock, and that section 8 of said general ordinance should not be held to apply to said route; and it was provided that should the person or company to whom said route should be awarded fail to comply with the terms and conditions of said section 13 of the ordinance of July 1, 1859, the mayor of the city should have full power to cause the stoppage or running of cars upon said railroad until said terms and conditions were complied with. October 11, 1864, supplementary to the ordinance fixing Route No. 8, etc. This ordinance awarded to Porteus B. Roberts the grant to operate the same, it being found that he was entitled to said grant under the terms of said ordinance. May 5, 1865, granting the contractor of said Route No. 8 authority to construct, lay, and use a double track on Main street, between Fifth and Liberty streets. September 22, 1885, to amend the ordinance fixing Route No. 8, by providing for the addition of certain other streets of the route. August 10, 1866, supplementary to the ordinance fixing Route No. 8, and giving the proprietors of said route to occupy streets therein named. September 13, 1867, granting another extension of contract. November 14, 1873, authorizing the proprietors of Route 8 to lay an additional track on Main street, from Liberty street to Court street, upon the same terms and to expire at the same time as the grant of the original Route No. 8.

The answer further sets forth that in pursuance of the ordinance of October 11, 1864, awarding to Roberts the right to construct Route No. 8, the contract was formally awarded to him by a commission consisting of the city auditor, city solicitor, and the president of the city council. On the 29th of October, 1864, the proper authorities of the defendant granted to said Roberts permission to construct and operate said street railroad on said route for the term and period of 20 years only, subject to all the provisions and requirements and conditions of said ordinance of August 19, 1864, and of the general ordinance hereinbefore referred to, passed July 1, 1859. On August 18, 1865, the defendant, by resolution duly passed, authorized said Roberts to transfer all his rights and interests in Route No. 8 to the Mt. Auburn Street-Railway Company. On April 13, 1868, the board of directors of the Mt. Auburn Street-Railway Company, by resolution, authorized the acceptance of the provisions of section 2 of the ordinance of October 20, 1865, relieving the street passenger railroads from the obligation to repair streets upon their agreement to pay a license fee of $100 annually for each car run upon their road. On April 30, 1868, said company formally accepted the modification of said contract with the defendant, in accordance with said resolution. The defendant admits that Route No. 8 was subsequently leased, and thereafter conveyed to the Cincinnati Inclined Plane Railway Company, but says that, if said company thereby acquired any right to hold and operate Route No. 8, it was subject to the terms and conditions of the original grant to Roberts, with only such modifications as were made therein by the ordinance above referred to, and that the grant to operate Route 8, by its terms, expired in 1884. The defendant says that neither the Cincinnati Inclined Plane Railway Company nor any other person or company has any right to operate said route, or to occupy the streets of the city of Cincinnati with the tracks of said Route No. 8.

Defendant, admitting that the general assembly of the state of Ohio passed an act relating to inclined plane railway companies organized under the act of May, 1852, entitled "An act providing for the creation and regulation of incorporated companies in the state of Ohio," alleges that said act is unconstitutional and void, being in conflict with article 13, § 1, of the constitution of the state of Ohio.

The defendant further avers that the Cincinnati Inclined Plane Railway Company acquired under said act no right to lease, purchase, or operate any street railway or lines or street railways in the streets of the defendant.

Defendant further answers that the resolution of the board of aldermen and

of the common council of the said city of 1871, which granted permission to
the inclined plane railway company to cross Main, Baltimore, and Dorsey
streets, and to occupy part of Guilford and Locust streets, by its terms limit-
ing the grant to 20 years from the date of its passage; that said grant has
expired, and that, therefore, said company has no right to maintain and oper-
ate its tracks or over such streets; that such company occupies a part of
Guilford and Locust streets, between Dorsey and Saunders streets, in such
a manner as to totally deprive the public of the use of the parts of said streets
so occupied; and that said company has no right to occupy said portion of
said streets under said resolution.

Defendant further says that the part of the street railway route operated by
said inclined plane railway company, between Mulberry street and Liberty
street, is operated under a pretended grant made by the common council of
the city of Cincinnati to the inclined plane railway company, under an ordi-
nance passed December 1, 1871; and that said grant was illegal and void, for
the reason that the grant was made without competition, due advertisement,
and letting to the lowest bidder, as required by law; and that said portion of
said route is not an extension of any street railway.

Defendant further says that that portion of the route operated by the in-
clined plane railway company extending, by double tracks, from the inclined
plane, on Locust street, thence northerly to Mason street, on Mason to Auburn
street, with a single track, from Mason northerly to Vine, and, by double track,
to the corporation line of the city and Avondale, is operated under a pretended
grant made under an ordinance of the city of Cincinnati passed October 27,
1875; and that said grant and said ordinance were illegal and void, for the rea-
son that said grant was made without competition, due advertisement, and
letting to the lowest bidder, as required by law, and because said grant is not
an extension of any street railway.

Defendant further says that the inclined plane railway company acquired no
right to operate the street railways operated by it, or to operate an inclined
plane railway, by the resolutions referred to in the bill of complaint, and passed
by the board of public affairs October 24, 1888, because the common council
of the city of Cincinnati did not concur in said resolutions, and the same were
not proven and signed by the mayor of said city; that said resolutions did not
purport to, and did not, make a grant of the right to operate any railway, or a
grant extending or renewing any of the rights of the inclined plane railway
company to operate any street railway route the grant for which had thereto-
fore expired. The defendant says that said resolutions were passed by said
boards upon the application and at the request of said inclined plane railway
company.

Defendant further answers: That on the 12th of December, 1890, it brought
an action in the superior court of Cincinnati, which court had jurisdiction of
the cause and of the parties, against the inclined plane railway company, to
recover certain license fees alleged to be due from said company to defendant,
and praying that said company be enjoined from maintaining and operating
its cars upon more than one track on Auburn street, between Mason and Vine
streets, and from maintaining its tracks or operating its cars upon any of the
tracks on Main, Court, Walnut, and Fifth streets, and for such other relief as
plaintiff might in equity be entitled to. That said company filed its answer in
said court, and a supplemental answer; and on May 3, 1892, the cause was
heard at the special term of said court, and reserved for hearing by the
general term of said court. That it was heard by the general term, and
that on October 21, 1893, a final decree was rendered by said general term
of said court, and judgment rendered therein that the inclined plane rail-
way company be, and the same was, perpetually enjoined from maintaining
any of its tracks, poles, wires, or other appliances on Main, Court, Walnut, or
Fifth street, and from operating any of its cars over any of said tracks, and
was perpetually enjoined from maintaining and operating more than one
street-railway track on Auburn street, between Mason and Vine streets; and
finding, further, that the inclined plane railway company was indebted to the
city for license fees of $100 per annum for each car operated over any of the
tracks of said railroad Route No. 8, as described in said plaintiff's petition in
said cause, from the year 1877, to and including the year 1884, reserving for

future ascertainment the liability of the plaintiff for unpaid license fees and percentage of gross earnings. That on the 23d of October, 1894, a judgment was rendered by the supreme court of the state of Ohio affirming the judgment and decree of the said superior court in general term (44 N. E. 327); and on the ―――― day of October, 1894, a mandate was sent from said supreme court to said superior court, in general term, to carry into effect said decree of affirmation.

Wherefore the defendant claims that under and by virtue of said judgment and decree, as well as for the other reasons in the answer and above stated, it has the right to remove the tracks, poles, wires, and other appliances maintained by said inclined plane railway company on Main, Court, Walnut, and Fifth streets, and to prevent said company from operating any of its cars over said tracks, and also the right to remove one of said railway company's tracks from Auburn street, between Mason and Vine streets, and to prevent said company from operating its cars on more than one track on Auburn street, between Mason and Vine; and that the use and occupancy by said inclined plane railway company of its tracks, and the operation of its railway, on the streets named in said judgment, are in violation of the injunction granted by said court; that said railway company has been, and now is, in contempt of said court for disobedience of said injunction.

The defendant, further answering, claims the right to prevent said railroad company from holding, maintaining, and operating said inclined plane across, over, or upon the streets mentioned in the said resolution of June 16, 1871, because the right to do so was never lawfully acquired by said company, and it has, moreover, by its terms, expired; also, that the defendant has the right to prevent said railway company from maintaining and operating said double tracks between Mulberry and Liberty streets, and Locust and Mason streets, and also its single track on Auburn street, also its tracks on Vine street, to the corporation line of the city of Avondale, because said inclined plane company never lawfully acquired the right to maintain and operate said tracks, or any of them, for the reasons in the answer and above stated. The defendant says that any and all orders by it made to require said inclined plane railway company to remove its tracks, with the electrical appliances, from the streets aforesaid, are lawful, and within the rights of this defendant, for the reason that said inclined plane railway company, as in the answer and above set forth, has no right whatever to use and occupy any part of the streets of the defendant for any purpose, and is a trespasser therein.

Finally, the defendant denies all and all manner of unlawful combination and confederacy, etc., and prays to be dismissed, with its reasonable costs.

The facts in this case are not in dispute. The inclined plane railway company was organized as set forth in the bill. The railway was constructed, afterwards leased, and subsequently transferred, to the inclined plane company, as stated in the bill, which also sets forth correctly the construction, by the proprietors, of a street railway known as "Route No. 8," extending from the foot of the inclined plane railway, at the head of Main street, to Fifth and Walnut, thence returning via Fifth and Main, to the place of beginning, and its subsequent acquisition and operation by the inclined plane railway company, under and by virtue of an act of the general assembly of the state of Ohio, passed March 30, 1877, relating to inclined plane railway companies organized under the general corporation act of May 1, 1852; also, a street railway extending from the head of the inclined plane railway to the Zoölogical Garden, in Avondale. Subsequent extensions were made and operated, as set forth in the bill. By stipulation, the ordinances set up in the answer are made part of the record. The execution of the mortgages set forth in the bill is admitted, and a statement of sales of bonds secured thereby is included in the stipulation. Other facts will be stated in the opinion.

E. A. Ferguson, Alex. P. Humphrey, and St. John Boyle, for complainant.

Outcolt, Granger & Hunt, for intervener.

Fred. Heitevestein and J. D. Brannon, for respondent.

SAGE, District Judge. Before discussing the question whether the decision of the supreme court of Ohio, referred to in the answer, in the case of City of Cincinnati v. Inclined Plane Ry. Co., 52 Ohio St. 609, 44 N. E. 327, is binding on this court, the force and effect of the statute of Ohio passed March 30, 1877, will, independently of that decision, be considered. The act is as follows:

"Section 1. Be it enacted by the general assembly of the state of Ohio, that any inclined plane railway or railroad company heretofore or that may hereafter [be] organized under the act of May 1, A. D. 1852, entitled, 'An act to provide for the creation and regulation of incorporated companies in the state of Ohio,' shall have power to hold, lease or purchase, and maintain and operate such portion of any street railroad leading to or connected with the inclined plane as may be necessary for the convenient dispatch of its business, upon the same terms and conditions on which it holds, maintains and operates its inclined plane: provided, that no other motive power than animals shall be used on the public highways occupied by such street railway company without the consent of the board of public works, in any city having such a board, and the common council or the public authority or company having charge or owning any other highway in which such street railroad may be laid; and provided, that no inclined plane railway or railroad company shall construct any track or tracks in any street or highway without first obtaining the written consent of a majority of the property holders on the line of such proposed track or tracks, represented by the feet front of lots abutting on the street or highway along which such track or tracks are proposed to be constructed.

"Sec. 2. No such purchase or lease shall be made without the consent of the holders of the stock in the company purchasing or leasing, and in the company leasing or selling such street railroad, or of the owners thereof.

"Sec. 3. This act shall take effect on its passage."

The contention for the complainant is that inasmuch as the inclined plane company was organized under the act of May 1, 1852, it had perpetual existence, with the franchise to build, maintain, and operate its inclined plane and railway, and that these franchises were likewise perpetual. The greater part of the inclined plane was built on property the fee of which was vested in the company. It, however, occupied a part of Locust street, and crossed above grade, and at such a height as not to obstruct travel, Miami, Baltimore, and Dorsey streets, under permission granted by resolution of the board of aldermen and the common council of the city of Cincinnati in 1871, which limited the grant to 20 years from the date of its passage. This limitation, it is contended, did not constitute one of the terms and conditions upon which the company held, maintained, and operated its inclined plane, any more than if the company had leased from some private individual, for a limited term, part of the property upon which it built its inclined plane. The argument is that in either case the corporate existence would not terminate when the time of the grant or of the lease expired, but the corporation would still have the power either to have the lease renewed for another definite term, or perpetually, or, failing in that, to condemn the right in perpetuity under the express power granted in section 12 of the act of May 1, 1852.

It is, moreover, urged that, as the company acquired the land on both sides where it crossed the streets and built its inclined plane at such a height as not to impede public travel along the highway,

there would be really nothing to condemn, for the reason that the owner of abutting property retains all title to the highway, excepting such as is necessary for the public to secure a passage over it. It may be conceded, for the sake of the argument, that the existence of the company under the act of May 1, 1852, is perpetual, or, at least, without time limit, and that its franchises are of like duration. The weak point in complainant's contention is by reason of the fact that the municipality of Cincinnati is also a corporation, endowed with the control and management of the streets of the city, and that the twelfth section of the general corporation act of May 1, 1852, made it competent for the city as a municipality and any railroad company to agree upon the manner and upon the terms and conditions upon which the streets, or any part thereof, should be used or occupied. The section also contains a provision that if the parties shall be unable to agree thereon, and it shall be necessary, in the judgment of the directors of such a railroad company, to use or occupy such street, the company may appropriate so much of the same as may be necessary for the purposes of such road, in the same manner and upon the same terms as is provided for the appropriation of the property of individuals by the tenth section of said act. The provisions of this section define and limit the franchise which is granted to the city as a corporation, and that which is granted to the railroad company as a corporation. The inclined plane railway company recognized the right of the city, under section 12, to prescribe the terms and conditions upon which it should occupy Locust street, and cross the other streets named. The fee of those streets was vested in the public. The company accepted the grant from the city. The grant has terminated, and whatever may be said as to the right of the company to appropriate, by proper proceedings, so much of the streets as may be necessary for the purposes of its inclined plane, the fact is that it has not done so, and is a trespasser. Without a grant from the city, or an appropriation in accordance with the provisions of section 12, the company has no right to use or to occupy any part of any street in the city; and in that predicament it is now, and has been ever since long before the bill in this cause was filed, unless the city is estopped, which will be considered later in the opinion. The ownership by the inclined plane company of the land on both sides of the streets where they are crossed by the inclined plane track, while it might go to the question of the amount of compensation to be awarded, would not dispense with the necessity to institute condemnation proceedings. Referring now to the statute of March 30, 1877, we see that the power of the inclined plane company to hold, lease, or purchase, and maintain and operate, such portion of any street railroad leading to or connected with the inclined plane as may be necessary for the convenient dispatch of its business, is to be "upon the same terms and conditions on which it holds, maintains, and operates its inclined plane." If, therefore, the inclined plane company has no longer any right to hold, maintain, and operate its inclined plane, it has no right to maintain or operate the street railroads which it has acquired; and this is true whether the franchises of the inclined plane

company are perpetual, or are limited in time. In other words, the power or franchise to acquire the right is not equivalent to possessing the right.

But the defendant denies that the statute gave to the inclined plane company the right to maintain and operate Route 8 perpetually. Passing, for the present, the question whether the decision of the supreme court of Ohio upon this point is binding upon this court, it is clear that the act of March 30, 1877, does not, in express terms, confer any such right on the inclined plane railway company. If such was the intention of the legislature, it would have been easy to express it. Unless expressed, or resulting by necessary implication, it does not exist. The rules of construction do not favor implied grants.

The supreme court of the United States, in Minturn v. Larue, 23 How. 436, said:

"It is a well-settled rule of construction of grants by the legislature to corporations, whether public or private, that only such powers and rights can be exercised under them as are clearly comprehended within the words of the act, or derived from them by necessary implication, regard being had to the objects of the grant. Any ambiguity or doubt arising out of the terms used by the legislature must be resolved in favor of the public."

In Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S., at page 49, 11 Sup. Ct. 478, the opinion of the supreme court contains the following:

"By a familar rule, every public grant of property, or of privileges or franchises, if ambiguous, is to be construed against the grantee, and in favor of the public, because an intention on the part of the government to grant the private persons, or to a particular corporation, property, or rights in which the whole public is interested, cannot be presumed, unless unequivocally expressed or necessarily to be implied in the terms of the grant, and because the grant is supposed to be made at the solicitation of the grantee, and to be drawn up by him or by his agents, and therefore the words used are to be treated as those of the grantee; and this rule of construction is a wholesome safeguard of the interests of the public against any attempt of the grantee, by the insertion of ambiguous language, to take what could not be obtained in clear and express terms."

See, also, Slidell v. Grandjean, 111 U. S. 437, 438, 4 Sup. Ct. 475; Oregon Ry. & Nav. Co. v. Oregonian Ry. Co., 130 U. S. 26, 27, 9 Sup. Ct. 409; 4 Thomp. Corp. p. 4357, § 5659, and cases there cited; Stein v. Water-Supply Co., 141 U. S., at page 80, 11 Sup. Ct. 892, where the supreme court quote with approval from The Binghampton Bridge, 3 Wall. 51, 75, that, "in grants by the public, nothing passes by implication"; and "if, on a fair reading of the instrument, reasonable doubts arise as to the proper interpretation to be given to it, those doubts are to be solved in favor of the state; and where it is susceptible of two meanings, the one restricting, and the other extending, the powers of the corporation, that construction is to be adopted which works the least harm to the state." The supreme court refer to this rule as one "in respect to which there is no difference of opinion in the courts of this country," and, applying it, held that a grant, under legislative authority, of an exclusive privilege, for a term of years, of supplying a municipal corporation and its people with water drawn by means of a system of waterworks from

a particular stream or river, does not prevent the state from granting to other persons the privilege of supplying, during the same period, the same corporation and people with water drawn in like manner from a different stream or river.

The court of appeals of the state of New York, in People v. Newton, 112 N. Y. 399, 19 N. E. 831, said:

"The terms of the grant conferring the right which is asserted are to be strictly construed, and the privilege it confers cannot be extended by inference. If there is any ambiguity, it must operate against the company, the general rule being that the grant shall be construed most strongly against the party claiming under it, and every reasonable doubt resolved adversely to it. Nothing is to be taken as conceded; nothing is to be included in the grant but what is given in unmistakable terms; and, as was said in Langdon v. Mayor, 93 N. Y. 145: 'Whatever is not unequivocally granted is deemed to be withheld;' nothing passing by implication. The affirmative must be shown. The court is not to search for any hidden meaning."

The supreme court of Indiana, in Western Paving & Supply Co. v. Citizens' St. R. Co., 128 Ind. 530, 26 N. E. 188, and 28 N. E. 88, declared that it was—

"settled that such charter is to be strictly construed against the railway company, and that it has no doubtful rights under such charter, for, where there are doubts, they are construed against the grantee, and in favor of the city."

In Pennsylvania R. Co. v. Canal Com'rs. 21 Pa. St. 22, Chief Justice Black said:

"When a state means to clothe a corporate body with a portion of her own sovereignty, and to disarm herself to that extent of the powers which belong to her, it is so easy to say so that we will never believe it to be meant when it is not said. * * * In the construction of a charter, to be in doubt is to be resolved; and every resolution which springs from doubt is against the corporation."

The supreme court, in Fertilizing Co. v. Hyde Park, 97 U. S. 666, was no less emphatic:

"Every reasonable doubt is to be resolved adversely [to the corporation]. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare. It is axiomatic in the jurisprudence of this court."

The supreme court of Louisiana, in New Orleans & C. R. Co. v. City of New Orleans, 34 La. Ann., at page 447, uses the following language:

"Charters and other acts conferring powers and privileges upon corporations, though ostensibly mere ordinary acts of legislation, are usually prepared by the parties interested, and by them submitted for legislative approval. This is one among many reasons why they are always so strictly construed. Pierce, R. R. p. 491.

"They are assumed to have been prepared with care and forethought, and to embody clearly all the rights and privileges which it was supposed the legislature would have been willing to grant. To permit such privileges to be cloaked and covered up under ambiguous and equivocal expressions, not distinctly presenting the subject of their extent and propriety to the legislative mind, would be to expose the legislature to deception, and to enable parties, by artful duplicity of language, to claim and enjoy privileges which, it may be, the lawmaking power did not intend to grant, and would have refused had they been directly and clearly asked.

"Against the possibility of the success of such devices, the judiciary sets its face like flint."

Keeping these rules of construction in mind, let us now consider what the effects of the construction claimed by complainant would be. They are fully set forth by Judge Smith, of the superior court of Cincinnati, in the City of Cincinnati v. Cincinnati Inclined Plane Ry. Co., 30 Wkly. Law Bul. 324, 325. Among them are the following, as stated by defendant's counsel in their brief:

"(1) To remove all limitations on the life of any grant for a street railway which an inclined plane railway company might acquire, and to give such company a perpetual right in the streets occupied by such street railways.

"(2) To deprive the city of its stipulated rights to car licenses and percentages on earnings, and of its right to charge the company with part of the expense of repairing the streets, where such rights had been reserved in the ordinances originally creating the grants.

"(3) To give to a class of inclined plane railway companies (those incorporated under the act of 1852) rights which could not be granted to any other companies, whether inclined plane or street railway companies, or to individuals under the laws, since they would be free from the restrictions of the various statutes, beginning with the act of May 14, 1878, which forbade cities to make or renew street railway grants for a longer period than twenty-five years.

"(4) To oblige cities to permit inclined plane railway companies to use the streets for street railways on the companies' own terms, under penalty, in case of the refusal of the city, of having the right of way over any and all streets condemned for the use of the company in perpetuity.

"(5) To enable the inclined plane railway companies in Cincinnati organized under the act of May 1, 1852, to acquire any existing street railroad which leads to or connects with its inclined plane, and thus enable these companies to operate practically all the street railroads in the city in perpetuity, and free from all restrictions except such as the city might, by common-law right, impose independently of any power reserved in the original grants.

"(6) To permit the Cincinnati Inclined Plane Railway Company to charge such rates of fare upon portions of street railroads acquired by it as the company might see fit to charge, there being no limitation as to the rate or fare in the grant by the city to the inclined plane railway company of permission to cross and occupy certain streets with its inclined plane. While it may be admitted that the state could, by subsequent legislation, control the rate of fare to be charged on street railroads by inclined plane companies, yet the city would have no such right, unless it had been reserved by contract.

"(7) As railway companies incorporated under the act of May 1, 1852, are authorized to operate general traffic railroads, which have the right to carry freight as well as passengers, the construction claimed by complainant for the act of March 30, 1877, would authorize inclined railway companies to transport freight over the street railroads acquired by them, and to use for that purpose such large and heavy cars as would increase the wear and tear of the streets, and necessitate more frequent repair of the streets, at the expense of the city."

From these considerations, and upon the application of the rules of construction hereinbefore set forth, it is clear that the Cincinnati Inclined Plane Railway Company did not, by the transfer of Route 8, acquire the right to maintain and operate that route perpetually. This court agrees with the superior court in its opinion, which was affirmed by the supreme court of Ohio, that the true construction of the provision of the act of March 30, 1877, giving the company right to hold, maintain, and operate street railways on the same terms and conditions upon which it held, maintained, and operated its inclined plane, is to regard the provision as having reference only to the terms and conditions spoken of in the twelfth section of the act of 1852, and that the act merely granted to inclined plane railway

companies power to hold, lease, or purchase, and maintain and operate, certain portions of street railroads, but made no grant to the company of any street-railway franchise, nor did it give, or purport to give, to the company permission to use any streets for street railways. The act cannot properly be so construed as to compel the city to make a grant, or to permit the assignment of a grant, to an inclined plane railway company upon any other terms and conditions than those which the city has the right to exact from any grantee of a street-railway route. The argument of counsel for the complainant that inasmuch as section 2 of the act of March 30, 1877, provides that no purchase or lease under section 1 shall be made without the consent of the holders of the stock in the company purchasing or leasing, and in the company leasing or selling, such street railroad, or of the owners thereof, no consent of the city is required, and that, therefore, all rights which the city had against the original owner of the street railroad leased or purchased by an inclined plane railway company are destroyed, is altogether untenable. That section may dispense with the consent of the city to an assignment of an existing grant, by deed of conveyance or by lease, but it does not destroy any of the conditions upon which the grant was made, or release its owners or assignees from any of the burdens imposed by the contract between the city and the original grantee. The conclusion of the court is that, upon a lease to or purchase by the inclined plane railway company, that company would take the street railroad leased or purchased subject to all the terms and conditions imposed by the city, and under which it had theretofore been maintained and operated.

These questions, however, are foreclosed in this court by the opinion of the supreme court of Ohio in the case of City of Cincinnati v. Inclined Plane Ry. Co. It is true that the supreme court did not file an opinion in the case, but it did what was equivalent; it affirmed the judgment, for the reasons stated in the opinion below. 52 Ohio St. 609, 44 N. E. 327. That affirmation was an adoption of the opinion of the superior court in general term, in which the matters were fully and ably discussed, and the conclusion reached that the inclined plane railway had no longer any right to maintain and operate the lines of street railway involved in the case. The company was, however, allowed six months in which to apply to the city authorities for a new grant to maintain and operate such lines. The judgment of the court included Route 8, and the tracks on Main street between Liberty and Mulberry, under the ordinance of 1871, and on Locust and Main streets, and one of the tracks on Auburn street, under the ordinance of 1875. The decision is based upon the construction of certain statutes of Ohio conferring certain powers upon municipal corporations, and imposing limitations upon their powers, and the construction put by the state court upon such statutes is binding on the federal courts in Ohio.

In City of Detroit v. Osborne, 135 U. S. 492, 10 Sup. Ct. 1012, it was held that the local law of a state conferring the right to recover from a municipal corporation for injuries caused by defects in its highways and streets is binding upon courts of the United States

within the state.    The court quoted with approval the following language from Claiborne Co. v. Brooks, 111 U. S. 410, 4 Sup. Ct. 489:

"It is; undoubtedly, a question of local policy with each state what shall be the extent and character of the powers which its various political and municipal organizations shall possess; and the settled decisions of its highest courts on this subject will be regarded as authoritative by the courts of the United States, for it is a question that relates to the internal constitution of the body politic of the state."

To the same effect, see Norton v. Shelby Co., 118 U. S. 440, 6 Sup. Ct. 1121; Meriwether v. Muhlenburg Co. Ct., 120 U. S. 357, 7 Sup. Ct. 563; Rich v. Mentz Tp., 134 U. S. 632, 10 Sup. Ct. 610.

These cases are clearly distinguishable from the cases cited by counsel for the complainant.    Butz v. City of Muscatine, 8 Wall. 575, was a case in which it was held that, where a question involved in the construction of a state statute practically affects those remedies of creditors which are protected by the constitution, a federal court will exercise its own judgment on the meaning of the statute, irrespectively of the decisions of the state courts.    In that case the state statute limited the authority of the counsel to levy a tax upon the property of the state, and the supreme court held that the statute did not apply to a case where a judgment had been recovered against the city.    Chicago v. Sheldon, 9 Wall. 55, held that a contract having been entered into between parties, valid at the time, by the laws of the state, no decision of the courts of the state subsequently made can impair its obligation.    Township of Pine Grove v. Talcott, 19 Wall. 673, decided that questions relating to bonds issued in a negotiable form under an act of the legislature of the state involved questions relating to commercial securities; and whether, under the constitution of the state, such securities are valid or void, belongs to the domain of general jurisprudence, and the decisions of the state court are not binding upon the federal courts.    In Block v. Commissioners, 99 U. S. 699, after negotiable bonds had been issued and negotiated, and after the rights of the holders thereof had become fixed, an opinion was delivered by the supreme court of the state as to their validity; and the supreme court of the United States held that it was at liberty to follow its own convictions of the law, and was not bound by the decisions of the state court.    In Burgess v. Seligman, 107 U. S. 21, 2 Sup. Ct. 10, the supreme court, recognizing the controlling effect of decisions of the state courts which become rules of property and action in the state, and having all the effect of law, especially with regard to the law of real estate, the construction of state constitutions and statutes, asserted the right and duty of federal courts to exercise their own judgment whether the law has not been thus settled, and with reference to the doctrine of commercial law and general jurisprudence.

The doctrine of estoppel is invoked by counsel for the complainant upon the grounds:

(1) That, immediately after the passage of the act of 1877, the inclined plane company acquired Route 8 by lease for 99 years, renewable forever, with privilege of purchase.

(2) That from the time of this acquisition no percentage of gross

earnings or car licenses which were required to be paid under the ordinance establishing Route 8 was paid to nor demanded by the city, and, on the contrary, the property was taxed under the steam railroad law.

(3) On January 1, 1879, the company executed a mortgage to Peachey and Goodman, trustees, upon all and singular its railways, franchises, and property, including Route 8; and the lessors joined in the mortgage, so that it might be superior to their claim for rent; and there were issued, under it, bonds to the amount of $125,000, which were used for the purpose of paying the debts of the company, and making improvements on the property.    On September 24, 1885, the substitution of electricity, cable, or compressed air as a motive power upon all the roads then held by the inclined plane company was consented to by the board of public works of the city.

(4) That on August 12, 1887, by direction of the board of aldermen and councilmen of the city, its clerk submitted to the board a report upon the street railroads of the city, which informed the board of the routes operated by the inclined plane railway company. That report included a communication from Hon. E. A. Ferguson, representing the owners of the lines, which set forth the acquisition and the action of the board of public works consenting to the substitution of electricity, cable, or compressed air as a motive power, and gave a full history of the franchises at that time held, maintained, and operated by the inclined plane company. In October, 1888, the company, having applied to the board of public affairs (which in the the meantime had taken the place of the board of public works) for permission to erect along the entire length of the road the poles, wires, and other appliances necessary to operate and maintain the whole line as an electric road, and to change and relay the tracks, and improve the curves and switches, from Liberty street north to the Zoölogical Garden, so as to better adapt them to the running of cars by electricity, and having obtained the desired permission upon certain conditions, relating to the change and relaying of the tracks, and improving the curves and switches, and fixing the conditions under which the permission should be exercised, proceeded to carry out the terms of this permission, and on January 1, 1889, executed a mortgage to the complainant to secure bonds to the amount of $500,000, of which $125,000 were to be reserved against the bonds outstanding under the trust mortgage to Peachey and Goodman and the remaining bonds, $375,000, were issued, as was also $125,000 of preferred stock; and the money from the sale of these bonds and stock was used to equip the line with electricity, relay the tracks, reconstruct the inclined plane, and build a power house.

The court adopts the view taken by counsel for the city in answer to the claim that the city is estopped, placing their contention upon the following grounds: The city did not require nor compel the railway company to make any changes. Upon the company's request, not made to the city, but to the administrative board only, that board authorized the change from horse power to electric power. The inclined plane was reconstructed without any permission. The acts of the board of public works and the board of public affairs were

simply permissive. They did not purport to confer any rights upon the railway company, nor anything more than the privilege to make the changes for which the company sought their consent. The boards had the right to suppose that the railway company knew what its title was, and that it assumed all the risks involved in the change of its motive power. A municipal corporation is not estopped by reason of the act of a board not authorized to bind the city by its independent action. 2 Dill. Mun. Corp. (4th Ed.) § 660. The common council of a city can only contract by ordinance, resolution, or order, and an illegal and void contract cannot lay the foundation for an estoppel.

In Richardson v. Grant Co., 27 Fed. 495, it was held that municipal or public corporations are not liable on a quantum meruit for the value of materials furnished under illegal or forbidden contracts when the municipality could not choose whether or not it would retain or reject the benefit of such work or materials. See, also, McCracken v. City of San Francisco, 16 Cal. 591, cited by the supreme court of the United States in Merrill v. Monticello, 138 U. S. 687, 11 Sup. Ct. 441.

The resolutions consenting to the change of motive power did not create or renew a grant, nor did they constitute either an expressed or implied recognition of any valid existing grant. State v. Cincinnati Gaslight & Coke Co., 18 Ohio St. 262. The cases in which an estoppel in pais may be raised against a municipal corporation are where the defect was formal, and where the other party had relied upon the contract, and the municipal corporation had received money or property under it. See City of Detroit v. Detroit City Ry. Co., 60 Fed. 166, and cases there cited. The reversal of the judgment in that case was upon another ground, and did not affect the proposition here stated. In the case at bar the resolutions relied upon to raise an estoppel do not show any intention to make a contract granting or renewing a right. They were not competent to accomplish that request, because the boards passing them could not lawfully make or renew a grant, nor did the city receive any money or property. Cincinnati & S. Ry. Co. v. Incorporated Village of Carthage, 36 Ohio St. 631.

The complainant and the bondholders were bound to know the law of the state, to take notice of the limitations on the power of the board of public works and the board of public affairs, and of the statutory restrictions as to the mode and manner of making contracts by the city. They were bound, also, to know that in State v. Bell, 34 Ohio St. 194, it was decided, two years before the first mortgage was made, that the board of public works had no power to make a street-railway grant. It is necessary, upon claiming rights by estoppel, to be able to define the rights claimed. Counsel for the complainant go no further than to claim that the complainant is entitled to have the railway operated until the bonds are paid. But, as is suggested by counsel for the defendant, suppose the company failed to make money enough to pay the bonds; what would happen? And, upon foreclosure proceedings, the road should sell for enough to pay the bonds; what would the purchaser of the road

get? How long would the estoppel operate in favor of the purchaser? The failure to oust the company from the operation of Route 8 after the expiration of the grant therefor, in 1881, gave to the company no new rights. They continued to use the streets only by sufferance. The failure to exact the payment of car license for the cars run upon Route 8 could not work an estoppel against the city, because the neglect of the city to enforce its rights would have no effect, excepting so far as the statute of limitations might come into play. It has been held that a consent to a change of motive power creates no grant or license to use the streets. It is a mere act of regulation. In re Third Ave. R. Co., 121 N. Y. 536, 24 N. E. 951.

As to the report made by the city clerk to the board of aldermen, it was read, ordered to be printed, and no other action was taken upon it. It was never read in the board of councilmen, and it did not, nor did the letter of Mr. Ferguson, which was incorporated in the report, suggest any claim by the railway company the right to operate its street railways in perpetuity. Mt. Adams & E. P. Ry. Co. v. City of Cincinnati, 23 Wkly. Law Bul. 68; Zottman v. San Francisco, 20 Cal. 97.

The taxation of the property of the inclined plane railway company under the steam railroad law was by the county auditor. The city had nothing to do with it, no authority over it, and it was not shown that the inclined plane railway company was thereby compelled to pay any greater amount of taxation than if it had been taxed as a street-railway company. The application of the company to relay its tracks in certain streets that were repaved was altogether independent of the question whether it occupied the street under a contract or under a license. The authorities in support of the proposition that the company must relay its tracks when the street is improved, and that the obligation exists independently of any express statutory requirement or specific agreement with the municipal authorities, are cited in Booth on Street Railways, at section 254, where the law is so stated.

The supreme court of Ohio, in Railroad Co. v. Defiance, 52 Ohio St. 262, 40 N. E. 89, held that the—

"Powers conferred on municipal corporations with respect to the opening, improving, and repairing of their streets and public ways are held in trust for public purposes, and are continuing in their nature, to be exercised from day to day as the public interests may require; and they cannot be granted away, or relinquished, or their exercise suspended or abridged, except when and to the extent that legislative authority is expressly given to do so. Such authority is not given by section 3283 of the Revised Statutes."

Section 3283 is section 12 of the corporation act of May 1, 1852, revised. The two sections are identical in substance. The difference is only in the manner of expression. The city was prohibited by statute from making any grant to a street railway for a period longer than 25 years. Can it be possible that, by conduct or silence or acquiescence, it could extend such grant indefinitely or perpetually, or, in other words, accomplish indirectly what it was beyond its power to do directly? The supreme court recognized and applied

in Railroad Co. v. Defiance the rule with reference to the construction of grants which has been hereinbefore stated, to wit, that they "will be construed strictly against the grantee, and liberally in favor of the public, and never extended beyond their express terms, when not indispensable to give effect to the grant."

The only remaining question to be considered is whether section 720 of the Revised Statutes applies to this case. That section provides that:

"A writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a state, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy."

This section, it has been held, must be construed in connection with section 716, which provides that:

"The supreme court and the circuit and district courts shall have power to issue writs of scire facias, and to issue all writs not specifically provided for by statute which may be necessary for the exercise of their respective jurisdictions, and agreeable to the usages and principles of law."

These provisions, however, do not affect this case, nor do the provisions of sections 640 and 646 of the Revised Statutes, by which also the interpretation of section 720 is restricted. Those sections relate to cases removed from the state courts to the federal courts, and authorize federal courts, by injunction, to prevent further proceedings therein in the state courts.

Section 720, it has been held, applies not merely to staying proceedings in any court of a state, but is an inhibition against staying a party in the conduct of the proceedings in a state court. Fisk v. Railroad Co., 6 Blatchf. 362, Fed. Cas. No. 4,827. It applies, also, to prevent an injunction staying a party at any stage of the proceedings in a state court, as where the proposition was to enjoin a sale of land under an order of the state court. Sargent v. Helton, 115 U. S. 348, 6 Sup. Ct. 78; Chapman v. Brewer, 114 U. S. 158, 5 Sup. Ct. 799. Property in the hands of a sheriff under process issued by a state court will not be interfered with by injunction from a federal court, nor can a party be restrained from taking possession of property which the judgment of a state court requires to be delivered to him. Watson v. Jones, 13 Wall. 679. Section 720 also prohibits the issue of an injunction to restrain the sale of property under an execution issued out of a state court, although application is made by a third person whose property is taken. Watson v. Bondurant, 2 Woods, 175, Fed. Cas. No. 17,278; Perry v. Sharpe, 8 Fed. 23. It has been held that the holder of a chattel mortgage cannot enjoin the sheriff from selling the property under execution of a judgment against the mortgagor. Ruggles v. Simonton, 3 Biss. 325, Fed. Cas. No. 12,120. It follows that this court, even if its opinion upon the merits of this controversy were in favor of the complainant, could not by injunction prevent the city of Cincinnati from reaping the fruits of its litigation in the state court with the inclined plane company.

The validity of the act of March 30, 1877, under the constitution of the state of Ohio, is denied by counsel for defendant. It is not necessary to the decision of this cause to enter upon the discussion

of this question, which belongs, primarily, to the domain of state jurisprudence, and which a federal court will not take up excepting under an imperative necessity.

The equities of this cause are with the defendant. The bill will be dismissed, at the complainant's costs.