In re THOMPSON. Petition of PIEDMONT COAL CO. et al. In re HUSTEAD.

(District Court, W. D. Pennsylvania. March 1, 1923.)

No. 8790.

1. **Bankruptcy ⬥⟿308—Surety is entitled to subrogation.**
Both at common law and under Bankruptcy Act, § 57i (Comp. St. § 9641), a surety who has paid a debt of the bankrupt, in whole or in part, is subrogated to the rights of the creditor pro tanto.

2. **Bankruptcy ⬥⟿312—Surety, who paid part of valid judgments against bankrupt, held not estopped to enforce judgment liens as subrogee.**
A surety on notes of bankrupt, which were reduced to judgments and secured by attachment liens on land in another state more than a year prior to the bankruptcy, who had paid part of the judgments, but asserted his right, with the knowledge of all parties, to stay out of the bankruptcy proceedings, *held* not estopped to enforce the judgment liens as subrogee pro tanto, by a sale of the property by the trustees free from incumbrance and payment from the proceeds of the remainder of the judgments under a compromise agreement with the judgment plaintiffs, to which arrangement the surety was not a party.

3. **Bankruptcy ⬥⟿364—Proof of unsecured claims does not affect claimant's rights as to secured claims.**
Proof and receipt of dividends on unsecured claims does not estop the claimant from enforcing a lien securing other claims.

4. **Bankruptcy ⬥⟿268—Bankruptcy Act does not authorize injunction restraining suit in state court at instance of purchaser of bankrupt's property.**
The Bankruptcy Act does not, within the meaning of Judicial Code, § 265 (Comp. St. § 1242), authorize a federal court to grant an injunction staying a suit in a state court to protect the interests of a purchaser of property at a bankrupt sale.

5. **Bankruptcy ⬥⟿217(3)—Court may not enjoin enforcement of valid judgment liens.**
A court of bankruptcy is without power to enjoin enforcement of liens obtained through judgments of a state court in attachment suits more than four months prior to the bankruptcy proceedings, which under Bankruptcy Act, § 67f (Comp. St. § 9651), are not affected by such proceedings.

In Bankruptcy. In the matter of Josiah Van Kirk Thompson, bankrupt. On motion to dissolve preliminary injunction. Motion granted. See, also, 276 Fed. 313.

W. D. Stewart, of Pittsburgh, Pa., and McCamic & Clarke, of Wheeling, W. Va., specially, for J. Edgar Hustead et al.

---

⬥⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

W. D. Stewart, of Pittsburgh, Pa., specially, for Chas. McCamic.

Samuel McClay and W. A. Seifert (of Reed, Smith, Shaw & Beal), both of Pittsburgh, Pa., and Frank W. Nesbitt, of Wheeling, W. Va., for Piedmont Coal Company and Ayrshire Corporation.

Waitman H. Conaway, of Fairmont, W. Va., A. Leo Weil, of Pittsburgh, Pa., and R. E. Umbel, of Uniontown, Pa., for trustee in bankruptcy.

THOMSON, District Judge. This is a motion to dissolve a preliminary injunction granted by this court, on petition of the Piedmont Coal Company and the Ayrshire Corporation, to restrain the further prosecution of certain equity suits for the enforcement of liens in the state courts of West Virginia. The material facts of the case, while somewhat involved, are not seriously in dispute; the controversy arising over the legal principles applicable to the facts, and the proper legal conclusions to be drawn therefrom.

In 1915, two suits in equity were commenced against J. V. Thompson of West Virginia, one in Marshall county by the National Bank of West Virginia, wherein over 3,000 acres of coal lands were attached, and the other by Beeson H. Brown, against Thompson, J. M. Hustead, and I. W. Semans, in Ohio county, wherein 1,500 acres of Thompson's coal land were attached. Shortly after the bringing of the last-named suit, the plaintiff died, and the suit was continued in the names of his administrators. The suit of the bank was based on notes wherein Thompson was principal and J. M. Hustead surety; the bank having sued Hustead, with attachment of his property, in Marshall county. In the suit of Brown, Hustead was also surety for Thompson. In each of the attachment suits, lis pendens was filed, giving notice to purchasers under the laws of West Virginia. A decree in rem in favor of the bank was rendered January 31, 1916, for $54,618.38, with interest and costs, and a like decree was rendered in favor of the Browns on August 5, 1916, in the sum of $117,749.64, with interest and costs. On September 10, 1917, Thompson was adjudged a bankrupt. After portions of the bankrupt's real estate had been sold, the Piedmont Coal Company, on June 10, 1919, made a proposition to the trustees in bankruptcy to purchase the remaining property of the bankrupt, real, personal and mixed, for the sum of $5,500,000, with certain other considerations therein named, free and clear of all taxes, attachments, and other liens, with certain specified exceptions not material here. This proposition was accepted by the trustees, subject to the court's approval, and on their petition the matter was referred to the referee, to whom a petition was presented, praying for leave to make sale of the bankrupt's said property to the Piedmont Coal Company, or its nominee, free and clear of liens as above stated.

In response to the notice to lien creditors, the National Bank of West Virginia appeared specially and filed its proof of claim, under reservation of its rights in the state court, for the full amount of its decree, objected to the sale free from liens and filed exceptions thereto, based chiefly upon the proposition that it had pending in the state court of West Virginia an adversary lien proceeding, begun more than four months prior to the bankruptcy proceeding, insisted on its rights to

énforce the same in the state court, and averred that the federal court was without jurisdiction to sell the lands discharged of liens. To avoid the sale of his attached property, J. Edgar Hustead paid to the bank on February 18, 1920, the sum of $23,798.95, which sum the bank credited on its judgment against Thompson. Three days later, on February 21, 1920, before the entry of the order of sale, the bank, through its counsel, Mr. McCamic, went before the referee and gave notice that Hustead had bought three notes for which his father was liable as surety; that he did not consent to the said agreement of sale and would not withdraw the objections thereto, so far as the notes on which Hustead was indorser, were concerned, and asserted that Hustead was subrogated to the rights of the plaintiff in the proceeding.

Previously, on June 21, 1919, the Husteads, as sureties, had paid through a sheriff's sale in Greene county, Pa., $52,036.43 on account of the Brown debt, for which Thompson, the bankrupt, was liable as principal. The Browns appeared specially in the bankruptcy court under objection to its jurisdiction, proved the full amount of their judgment, and objected and excepted to the sale free of liens, and filed a petition to revise the referee's findings, but did not give notice of the payment by the Husteads. During the course of the proceedings before the referee, the judgment and attaching creditors in West Virginia and the trustees entered into a contract whereby such lien creditors should receive 90 per cent. of their claims. On March 1, 1920, an order was entered by the United States court sitting as a court of bankruptcy, confirming the sale to the Piedmont Coal Company. In paragraph 6 of the decree so entered it is provided:

"That the liens so discharged from said properties shall be transferred to and follow the purchase money."

In the fourth paragraph it is provided:

"That the said compromise agreement with the West Virginia attachment and judgment creditors be and the same is hereby ratified, approved, and confirmed, upon the terms and conditions thereof. * * * "

The sixth paragraph provides:

"That the schedule of distribution, as per the compromise agreement with West Virginia attachment and judgment creditors, and as amended in the proceedings before said referee, be and the same is hereby approved and confirmed, except the items of Beeson H. Brown, John W. Brown, John W. Brown, administrator, and the National Bank of West Virginia at Wheeling, and these parties, or any of them, or the assignees of said claims, that elect to take the same from the fund aforesaid, shall be paid a dividend of 90 per cent. on the amounts determined to be due, with costs in full."

The amendment to the court's order was made on March 31, 1920, which reads as follows:

"(4) That the balance due on the claims listed in the schedule of distribution, with referee's report filed March 1, 1920, under compromise agreement not yet returned, in the name of 'National Bank of West Virginia at Wheeling,' the same pertaining to and being secured by attachments in Marshall county, West Virginia, is fixed and determined as of April 1, 1920, at and in the amount of $21,976.21, with costs of suit, and on motion of counsel the said schedule of distribution be and the same is hereby amended, and as provided in the order of final confirmation made March 1, 1920, in this matter, a dividend of 90 per cent. of the said amount, namely, $19,778.59, with

costs in the amount of $145.07, be and the same is hereby awarded to the said National Bank of West Virginia at Wheeling, and directed to be paid to it, its counsel or assignee, from and out of the fund referred to in the said order of final confirmation and in the distribution of the proceeds of the sale of the West Virginia real estate of the said bankrupt."

The exceptions filed on behalf of the bank, the Brown estate, and perhaps others, being withdrawn, on April 1, 1920, the bank was paid $19,778.59 and costs, by check of the trustees, and on that date the bank executed to the Piedmont Coal Company an assignment of "its right, title, and interest" in the judgment, and reserved and excepted therefrom "its said claim for which said attachment was levied to the extent that the same shall not be paid under it out of the estate of the bankrupt." It is thus clear that the "right, title, and interest" assigned was what remained of the judgment after giving credit for two payments credited thereon, one of which was that made by the Husteads, amounting to $23,798.95.

There was due on the Brown judgment as of March 1, 1920, the amount of the original decree, with interest, amounting to $144,234.57. The amended order of March 31, 1920, fixed the balance due Brown at $91,062.04. This was determined by taking from the full amount due the prior Hustead payment of $52,036.43. Ninety per cent. of this balance, together with costs, was paid by the trustees to Brown's administrator, and thereupon the Browns executed to the Piedmont Coal Company an assignment of his "right, title, and interest" therein of the same character as the assignment made by the bank. It appears from the records and the evidence that the sale to the Piedmont Coal Company was confirmed by a consent decree of the United States court, to which decree neither Hustead nor Brown consented. More than a year later, on April 18, 1921, the Piedmont Coal Company appeared and filed a petition in the suit of the bank against Thompson, in Marshall county, W. Va., setting up that the plaintiff therein, the National Bank of West Virginia, had assigned, transferred, and set over to the petitioner all its right, title, and interest as plaintiff in the said cause, and praying that it be substituted as plaintiff in place of the bank, and that all future proceedings in the cause be had in its name. An order of substitution was accordingly made by the court, and on motion of the substituted plaintiff the cause was dismissed. This proceeding being without notice to Hustead, the latter, within the period prescribed by the laws of West Virginia, moved by petition filed to set aside the aforesaid order. To this petition the Coal Company made a voluntary appearance, waived process on said petition, and leave was granted to answer or otherwise plead to the petition on or before October 15, 1921, on which day answer was accordingly filed. On the previous day, October 14, the Coal Company obtained the preliminary injunction granted by this court.

The Brown suit in Ohio county, W. Va., was never dismissed by the Piedmont Coal Company, and on June 24, 1921, the Husteads appeared and filed a petition therein, setting up their part payment of the judgment, asserting their pro tanto subrogation, and praying that the decree in rem against the bankrupt Thompson's attached property be enforced for their benefit to the extent of such payment. They were accordingly

admitted as parties plaintiff, but further proceedings therein were stayed by the temporary injunction granted by this court. Under this state of facts, the legal rights of Hustead in the bank and Brown judgments are plain, unless they had in some manner been waived or taken away.

[1] Had the Bankruptcy Act (Comp. St. §§ 9585–9656) been silent on the subject, the rights of a paying surety in a court of equity would have been fully recognized. At common law, when a surety pays to a creditor what the principal owed, he is entitled, unless he has waived his right, to be subrogated to all the rights possessed by the creditor in respect of the debt. Cases without number could be cited, sustaining the right of subrogation. The principle is well stated by Chief Justice Marshall, in Lidderdale v. Robinson, Fed. Cas. No. 8,337, as follows:

"The principle which the cases decide is this: Where a person had paid money for which others were responsible, the equitable claim which such payment gives him, or those who were so responsible, shall be clothed with the legal garb with which the contract he has discharged was invested, and he shall be substituted, to every intent and purpose, in the place of the creditor whose claim he has discharged. This principle of substitution is completely established in the books, and, being established, it must apply to all persons who are parties to the security, so far as is equitable. The cases suppose the surety to stand in the place of the creditor, as completely as if the instrument had been transferred to him, or to a trustee for his use."

On this proposition there is no divergence of opinion, the cases being in complete harmony. The right of subrogation, it has been frequently held, applies as well when payment has been made in part as where the entire debt has been paid. But the Bankruptcy Act was not silent on this important matter. Section 57i of that act provides:

"Whenever a creditor, whose claim against a bankrupt estate is secured by the individual undertaking of any person, fails to prove such claim, such person may do so in the creditor's name, and if he discharge such undertaking in whole or in part he shall be subrogated to that extent to the rights of the creditor."

[2] Under this section, not only is the surety entitled to subrogation to the extent of his payment, whether in whole or in part, but he is entitled to make proof of the claim in the name of the bank and Brown, who had proven in their own names the full amount of the liens. There was no necessity, therefore, for any proof on the part of Hustead, and, when he paid, the law subrogated him to the rights of Brown and the bank to the extent of his payments. Notice was given by the bank on February 1, 1920, in the bankruptcy court, of the payment by Hustead, and in almost the exact words of the statute its counsel asserted to the referee that Hustead was "subrogated to the rights of the principal in this proceedings." The bank, in appearing specially and proving its claim in full, but at the same time objecting to the jurisdiction of the bankruptcy court, filed exactly the practice approved by the Supreme Court in Pickens v. Roy, 187 U. S. 177, 23 Sup. Ct. 78, 47 L. Ed. 128. No objection appears in the record to the statement and notice given by the bank. The trustees in bankruptcy and the Coal Company took the benefit of the notice given, because the order of March 31, 1920, found the balance due the bank to be $21,976.21, on which balance

the trustees made payment. No order was made by the referee subrogating the assignee to the original claim.

Should the injunction stand and the Husteads be permanently enjoined from the enforcement of their rights as subrogees in the judgments obtained in the courts of West Virginia, their rights as paying sureties are wholly lost. The record shows, and it is not controverted, that the Coal Company agreed first to pay, as part of the purchase money, $1,000,000 for the properties in West Virginia. It later developed that this amount was not sufficient to pay 90 per cent. of the West Virginia liens, and this amount was increased to $1,020,000. The liens thus paid did not include the portions of the bank and Brown judgments paid by Hustead. If his liens therefor were divested, there was no fund whatever to which they were transferred, and out of which they could be paid. The result would be that his liens would be divested, and Hustead would recover nothing on account of the more than $78,000 which he paid on the bank and Brown judgments. This is a startling proposition in a court of equity. To sweep away a person's rights, which he is plainly and unmistakably given under the law, a conclusive legal reason would have to be assigned. I do not find such reason in this record.

[3] The claim that Hustead is estopped by reason of his acceptance of two 5 per cent. dividends on common claims in the bankruptcy court in Pennsylvania does not impress me. On the claim here in question, Hustead was surety, on liens which were more than four months old. These have an entirely different status from common claims. On these Hustead has been paid nothing. Equity will always prevent a merger in order to do equity. When these dividends were paid, the Husteads had continuously, to the knowledge of all parties in interest, insisted upon their right to stay out of the bankruptcy court on their lien claims, and the record fails to disclose that they have ever even yet been brought into the bankruptcy court as parties on these secured claims. Besides this, the payment of dividends was made after the rights of the petitioners had vested under their deeds. The position of the petitioners has been in no way changed by the act of the Husteads in accepting the dividends. Nothing was done to put Hustead upon an election. He was justified in assuming that the right was still present to follow the property and assert his liens, or that a fund had been set aside by the bankruptcy court for their payment. The principle of estoppel I think has no application here.

In the case of Brown, while no direct notice was given of the payment by the Husteads, the petition filed by the Coal Company in this case shows that they had notice of Brown's rights, for they set forth that the amount due Brown as of March 1, 1920, was $144,234.57, which was the amount of the prior decree in rem, with interest to that date; that they also had knowledge of the payment made by the Husteads is shown by the fact that the amended decree fixes the balance due Brown as $91,062.04. This balance was ascertained by crediting the amount otherwise due by the large payment made by Hustead thereon. The testimony of Judge Umbel and Mr. Higbee, the former being one of the trustees' counsel, that when Mr. Hustead was orally asked to come into the bankruptcy court his reply in substance was

that he had liens in West Virginia worth 100 per cent. and that he relied on his liens. Such also is the testimony of Hustead himself, and this evidence is uncontradicted in the record. Recitals of this testimony appear in an exhibit (F. F.) which Mr. Umbel prepared and submitted to Mr. Hustead for his signature. I cannot doubt, therefore, under the evidence, that the petitioners had notice of the suretyship relations of Hustead hereinbefore detailed.

The position that Hustead was a party to the Piedmont sale proceedings cannot be sustained. It ignores the real situation and the rights of Hustead as subrogee. When he paid Brown and the bank, he thereby acquired proportionately all their respective rights as they existed at the time of payment, including their right to lien priority, and their right to stay out of the bankruptcy proceedings, if they believed their state liens secured them, and thus justified such action. When Hustead paid, neither Browns nor the bank had come into the bankruptcy proceedings. Their presence there at that time was by special appearance only, and, had they decided to remain out entirely, that was their unquestioned right. It follows that such right accrued to the paying surety. After payment, neither the Browns nor the bank could do anything to take away the surety's rights without his consent. Neither a general appearance, a compromise agreement, a release, nor aught else, could defeat Hustead's right to control the privileges which had been vested in him as a surety making payment in good faith. Nor can it be said, as petitioners urge, that the decree of sale free from liens, not having been appealed from, is conclusive on Hustead. The decree contains certain conditions, one of which was that the compromise agreement with the West Virginia lien creditors was approved on the terms and conditions thereof. Neither the bank nor Brown was a party to this compromise agreement.

Another provision of the decree was that the schedule of distribution as shown by the compromise agreement was approved and confirmed, except the items of the Browns and the bank, "and these parties, or any of them, or the assignee of such claims, that elect to take the same from the fund aforesaid, shall be paid a dividend of 90 per cent. on the amount determined to be due, with costs in full." To make out even a prima facie claim under this decree, the petitioners would have to show that 90 per cent. of the bank and Brown claims were paid into a fund which, as the decree provides, "the liens so discharged from said properties shall be transferred to, and shall follow the purchase money." It is apparent from the record that the purchaser did not pay into the bankruptcy court any money whatever applicable to these Hustead liens. It paid into court merely the balances on these two liens which remained after the payment made thereon by Hustead.

[4] I have thus far considered the case on its merits, and find the law, under the facts, to be against the petitioners. But I am also of opinion that the court is without jurisdiction to issue the injunction prayed for. The purchaser in this proceeding has received its deeds for the lands purchased. As purchaser, it seeks through this court to enjoin the proceedings in the state court of West Virginia. That this cannot be done the case of Sargent et al. v. Helton, 115 U. S. 348, 6

Sup. Ct. 78, 29 L. Ed. 412, expressly decides. In that case, the lumber company becoming bankrupt, its property was sold to Sargent, the sale confirmed, and the property conveyed to the purchaser. In attachment suits begun a few days before the adjudication in bankruptcy, the state court ordered the property sold to satisfy the attachment liens. The purchaser, alleging the state court order of sale had thrown a cloud on the title and that the defendants other than the sheriff were party to the bankruptcy proceedings, filed a bill in the federal court to enjoin the sale. A demurrer to the bill was sustained, and this ruling was affirmed by the Supreme Court. That court quoted section 720 of the Revised Statutes (now section 265 of the Judicial Code [Comp. St. § 1242]), providing:

"That the writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a state, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy."

The Supreme Court then said:

"The question, therefore, is: Does any law relating to proceedings in bankruptcy authorize an injunction at the instance of a purchaser of property at a bankruptcy sale, or his vendee, to stay proceedings in a state court?"

This question was answered in the negative by Mr. Justice Woods in a lucid opinion, which leaves no uncertainty as to the law. This case was followed in Re Sawyer, 124 U. S. 220, 8 Sup. Ct. 482, 31 L. Ed. 402; Mills v. Provident Co., 100 Fed. 344, 40 C. C. A. 394; French v. Union Pacific Ry. Co. (C. C.) 92 Fed. 26; Louisville Trust Co. v. Cincinnati (C. C.) 73 Fed. 734. I am unable to see any substantial distinction between the case of Sargent v. Helton and the case at bar.

[5] Again, each of the two suits sought to be enjoined, created by attachments in the state courts, were more than four months old when the bankruptcy proceedings were filed. They were in process of enforcement in the state courts and are protected by section 67 (f) of the Bankruptcy Act. I will not stop to argue or elaborate this position. The authorities are numerous, clear, and convincing. They are thoroughly reviewed in the recent case of Griffin v. Lenhart, 266 Fed. 671, in an opinion by the Circuit Court of Appeals of the Fourth Circuit. Among others, the following cases are cited as controlling: Eyster v. Gaff, 91 U. S. 521, 23 L. Ed. 403; Pickens v. Dent, 106 Fed. 653, 45 C. C. A. 522; Metcalf v. Barker, 187 U. S. 165, 23 Sup. Ct. 67, 47 L. Ed. 122; Pickens v. Roy, 187 U. S. 177, 23 Sup. Ct. 78, 47 L. Ed. 128; Clarke v. Larramore, 188 U. S. 486, 23 Sup. Ct. 363, 47 L. Ed. 555; Globe Bank, etc., v. Martin, 236 U. S. 288, 35 Sup. Ct. 377, 59 L. Ed. 583; Stellwagen v. Clum, 245 U. S. 605, 38 Sup. Ct. 215, 62 L. Ed. 507.

It follows that the preliminary injunction heretofore granted must be dissolved, and the petition dismissed.